**SO ORDERED.**

**SIGNED this 24 day of May, 2013.**

_____
**Randy D. Doub**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILSON DIVISION

IN RE:

BONNIE J. CARLTON,                        CHAPTER 13
                                          CASE NO. 10-00079-8-RDD
    DEBTOR

### ORDER GRANTING MOTION FOR SECTION 362(K) SANCTIONS

Pending before the Court is the Motion for Section 362(k) Sanctions filed by Bonnie J. Carlton on September 21, 2012 (the "Motion") and the Response to Debtor's Motion for Sec. 362(k) Sanctions filed by Wells Fargo Bank, N.A. on October 12, 2012 (the "Response"). On May 14, 2013, the Court conducted a hearing on the Motion and the Response in Wilson, North Carolina.

### BACKGROUND

**I.    Pre-Petition Activities**

Prior to filing a petition under the United States Bankruptcy Code, Bonnie J. Carlton (the "Debtor") purchased a 2005 Nissan Murano (the "Vehicle") in March 2005. The Debtor financed the purchase with a loan from Capital One Auto Finance. Approximately one (1) year after the purchase of the Vehicle, WFS Financial, Inc. solicited the Debtor, offering to refinance the Vehicle at a lower interest rate. The Debtor then entered into a consumer loan with WFS Financial, Inc. dated February 28, 2009 and executed on March 6, 2009, whereby the Debtor refinanced $28,023.86

at 9.4561% interest for the term of five (5) years. Movant's Ex. 1. WFS Financial, Inc. then paid off the debt owed to Capital One Auto Finance, in the amount of $25,008.88. *Id*. The Debtor's new monthly payment was to be $548.02 with the first payment due on April 14, 2006 and subsequent payments due on approximately the fourteenth day of each month. *Id*. WFS Financial, Inc. later merged with Wells Fargo Bank, N.A. doing business as Wells Fargo Dealer Services successor to Wachovia Dealer Services, Inc., formerly known as WFS Financial, Inc. ("Wells Fargo").

Over the course of the loan, the Debtor regularly made payments to Wells Fargo late, often incurring late fees and charges for the missed payments. Wells Fargo's Ex. 3. Although the Debtor regularly made payments of $600.00, some $50.00 more than the required minimum payment, by September 2009 the Debtor had a total delinquency on the loan of $2,223.12. *Id*. The Debtor made payment of $600.00 on September 23, 2009. However, the Debtor was still several payments behind and Wells Fargo repossessed the Vehicle on September 29, 2009. *Id*.

The Debtor testified that she contacted Wells Fargo to inquire why the Vehicle was repossessed because she made the September payment. Wells Fargo informed the Debtor she was in default on the loan and that in order to have the Vehicle returned, she must make a payment of $2,481.00 before October 13, 2009. This amount represented the $825.00 repossession fee and another $1,656.00 in delinquent payments. On October 9, 2009, the Debtor mailed Wells Fargo a cashier's check for $2,500.00 via overnight express mail. Movant's Ex. 4. However, because October 9, 2009 was a Friday, and the following Monday was a federal holiday, Wells Fargo did not receive the cashier's check until Tuesday, October 13, 2009. After applying the $2,500.00 to her account, a Wells Fargo representative informed the Debtor that Wells Fargo would release the Vehicle to her.

At some point between September 29, 2009, the date of the repossession, and October 13, 2009, the date of the release, the repossession agent caused the Vehicle to be transferred to Adesa, Inc. ("Adesa"), an auction company with an auction site located in Charlotte, North Carolina. The Debtor arranged to travel from her home in Mount Olive, North Carolina to Charlotte, North Carolina to retrieve the Vehicle on October 16, 2009 at 1:30 pm. The Debtor testified the drive from Mount Olive to Charlotte is approximately four (4) hours. When the Debtor arrived at Adesa's Charlotte location, she discovered that the license plate had been removed from the Vehicle. The Debtor inquired about the license plate and was informed that the plate and registration had been turned over to the North Carolina Division of Motor Vehicles ("NCDMV"). The Debtor also learned that she was responsible for paying a vehicle storage fee of approximately $324.00 to Adesa. The Debtor testified that she did not feel comfortable driving the Vehicle from Charlotte to Mount Olive without a license plate or registration and did not believe she was liable to Adesa for the storage fee, as she had signed no contract with Adessa. Therefore, the Debtor stated that she returned home without the Vehicle.

Subsequently, on October 22, 2009, the Debtor made an additional payment of $600.00 to Wells Fargo. Wells Fargo's Ex. 3. The Debtor testified she contacted Wells Fargo several times after returning home without the Vehicle. She stated that she needed the license plate and registration returned from the NCDMV and that she did not agree to pay the storage fee for the release of the Vehicle. According to Mr. Richard Engel, National Bankruptcy Manager for Wells Fargo Dealer Services, Wells Fargo attempted to obtain the license plate and registration but informed the Debtor the NCDMV would only release the plate to the Vehicle's owner, which was still the Debtor. Further, Mr. Engel testified that Wells Fargo agreed to pay the storage fee to Adesa

3

and add the amount to the Debtor's account. When this did not satisfy the Debtor, Mr. Engel testified Wells Fargo then offered to split the amount of the storage fee with the Debtor. After deciding she would not pay any portion of the storage fee, the Debtor filed a complaint with the North Carolina Attorney General's Office, Consumer Protection Division on October 31, 2009.[1] The North Carolina Attorney General forwarded the complaint to the California Office of Attorney General because the corporation is located outside of the state and failed to respond to the North Carolina Attorney General's communications. Plaintiff's Ex. 17.

Over the course of the next two (2) months, the Debtor was unable to successfully negotiate the return of the Vehicle from Wells Fargo. On December 28, 2009, the Debtor received a notification of Wells Fargo's plan to sell property, indicating the Vehicle would be sold sometime after January 4, 2010. Wells Fargo's Ex. 7. In response to the notification, on December 29, 2009 and January 4, 2010, the Debtor sent Wells Fargo correspondence indicating she did not wish for the Vehicle to be sold. Movant's Ex. 10, 11. The Debtor testified that she then sought the advice of an attorney, who informed her that the only way to prevent the sale of the Vehicle was to file a bankruptcy petition and referred the Debtor to Adrian M. Lapas, a bankruptcy attorney in Goldsboro, North Carolina.

## II.   Post-petition Sale

After consulting with Mr. Lapas, the Debtor filed a voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code on January 6, 2010. According to Carrie E. Heath, legal

---

[1] The Debtor received a response on December 14, 2009 indicating the North Carolina Attorney General received no answer to their inquiries and forwarded the complaint to the Attorney General for the State of California for resolution. The California Attorney General forwarded the Debtor's concerns to Wells Fargo. In March, 2010, Wells Fargo responded to the Attorney General's inquiry explaining that the Vehicle was sold at auction on January 14, 2010.

assistant to Mr. Lapas, the Debtor's petition was an accelerated filing in that she filed just the bankruptcy petition on January 6, 2010. The Debtor filed the required schedules and other documents thirty (30) days later, on February 5, 2010. Both the Debtor and Ms. Heath testified that the petition was urgently filed in order to stop any sale and guarantee return of the Vehicle.

Ms. Heath testified that upon the filing of the Debtor's petition, she faxed a notice of the bankruptcy petition to Adesa and attempted to fax the same to Wells Fargo on January 6, 2009, but was unsuccessful in reaching Wells Fargo at the fax number she had. Ms. Heath stated she contacted Wells Fargo on the following morning to obtain a working fax number and faxed a notice of the Debtor's bankruptcy petition on the same day. Ms. Heath testified that when she spoke with a Wells Fargo representative, she was informed Wells Fargo sold the Vehicle on January 5, 2010, the day prior to the date of the filing of the petition. According to Ms. Heath, another employee in Mr. Lapas' office contacted Wells Fargo on January 21, 2010 and was also informed the Vehicle was sold on January 5, 2010.[2] Movant's Ex. 12. This statement is disputed by Wells Fargo, however, because the customer contact logs associated with the Debtor's account indicate that on January 21, 2010 an employee from Mr. Lapas' office was informed the Vehicle was sold on January 14, 2010. Wells Fargo's Ex. 4.

On February 4, 2010, Mr. Lapas informed the Debtor that Wells Fargo auctioned the Vehicle on January 5, 2010 and there was nothing he could do to get the Vehicle back. Movant's Ex. 13. Mr. Lapas stated that he could request additional information from Wells Fargo regarding the sale,

---

[2] According to Ms. Heath, Jennifer Rouse, another legal assistant in Mr. Lapas' office contacted Wells Fargo on January 21, 2010 to inquire about the Vehicle. Ms. Heath stated that Ms. Rouse was informed that Wells Fargo sold the Vehicle on January 5, 2010. However, records maintained by Wells Fargo indicate a representative advised Ms. Rouse the Vehicle was sold on January 14, 2010. Wells Fargo's Ex. 4.

but would incur additional fees to do so. *Id*. In the Debtor's schedules filed on February 5, 2010, the Debtor listed the debt related to the Vehicle as an unsecured claim in the amount of $9,490.72 in Schedule F. The Debtor indicated the claim was unliquidated, because the Debtor had no information as to the amount of any possible deficiency resulting from the sale. The Debtor listed the claim as disputed, explaining the "Debtor disputes claim as it may be subject to wrongful repossession." Schedule F, *In re Carlton*, Case No. 10-00079-8-RDD (Bankr. E.D.N.C. Feb. 5, 2010). On February 15, 2010, Wells Fargo filed proof of claim number 4-1 in the amount of $1,671.42, representing the unsecured deficiency from the auction of the Vehicle.[3]

A little over one (1) month later, the Debtor received information from the Office of the Attorney General for the State of California based on the complaint against Wells Fargo filed with the North Carolina Attorney General. In correspondence dated March 30, 2010, Wells Fargo indicated to the California Attorney General's Office that the Vehicle was sold at auction on January 14, 2010, some eight (8) days after the date of the filing of the petition. Movant's Ex. 17. The Debtor testified the correspondence from Wells Fargo to the California Attorney General was her first opportunity to learn the Vehicle had been sold after the date of the filing of the petition. Despite learning that sale occurred after the date of the filing of the petition, Mr. Lapas did not file a motion for turnover of the Vehicle or demand Wells Fargo provide the Debtor with a replacement vehicle. Nor did Mr. Lapas file a motion for sanctions on behalf of the Debtor for any potential violation of the automatic stay.

---

[3] As evidence of its claim, Wells Fargo attached the promissory note signed by the Debtor but no evidence of the auction of the Vehicle or the sales price.

The Debtor, who was dissatisfied with Mr. Lapas' representation, filed correspondence with the Court seeking to discharge Mr. Lapas as her attorney on September 14, 2010. Prior to the Court hearing the issue, Mr. Lapas filed a motion to withdraw from the Debtor's case on September 27, 2010 and the Court entered an order granting his withdrawal on September 29, 2010. The Debtor proceeded pro se for the remainder of the case until Wells Fargo filed the Motion for, Among Other Things, Relief from the Automatic Stay (the "Stay Motion") on April 11, 2012. In the Stay Motion, Wells Fargo admitted to selling the Vehicle on January 14, 2010, after it received notice of the Debtor's bankruptcy petition but explained that the sale occurred in error because the Debtor's account was placed in an "inactive" status. Wells Fargo requested relief from the automatic stay *nunc pro tunc* to January 14, 2010 to validate the sale of the Vehicle. The Stay Motion came before the Court on May 8, 2012 and the Court continued the matter to allow the Debtor to obtain new counsel. Debtor's present counsel filed a Notice of Appearance on May 25, 2012. Subsequently, Wells Fargo withdrew the Stay Motion on June 15, 2012 and the Debtor filed the current Motion on September 21, 2012.

In the Motion, the Debtor contends Wells Fargo is liable for damages for willful violation of the automatic stay pursuant to 11 U.S.C. § 362(k) and asks the Court to impose monetary sanctions in an amount no less than $60,000.00 as well as attorney's fees in the amount of no less than $7,500.00. The Debtor seeks to be made whole for the fair market value of the Vehicle, which ranges from $9,050.00 for rough trade-in value to $14,275.00 for clean retail value.[4] Movant's Ex.

---

[4] As of September 2010, the National Automobile Dealers Association assigns the following values the Vehicle, based on condition:

    Rough Trade-in: $9,050.00
    Average Trade-in: $10,300.00

18. Being without her primary mode of transportation, the Debtor's work hours decreased and she experienced a significant loss in income as a result. Therefore, the Debtor testified she rented vehicles between January 2010 and September 2012 and seeks reimbursement for the rentals in the amount of $9,885.00. Movant's Ex. 19. The Debtor also asserts that as a result of the repossession and subsequent auction of the Vehicle, she experienced significant stress because of her attempts to have Wells Fargo return the Vehicle. Further, the Debtor testified she experienced physical illness caused by the ordeal, such as headaches, dizziness, upset stomach, diarrhea, and high blood pressure. Finally, the Debtor asserts that the only reason she filed the Chapter 13 petition was to guarantee the return of the Vehicle, and as such, the Debtor requests that Wells Fargo be required to pay the remainder of her Chapter 13 plan payments.

    At the hearing, Wells Fargo admitted the Vehicle was sold in violation of the automatic stay, but asserts the violation was an error and not intentional. Mr. Engel explained that the sale of the Vehicle was most likely the result of human error, whereby an employee failed to properly flag the Debtor's account as bankrupt within Wells Fargo's computer system or an employee in Wells Fargo's remarketing department failed to properly identify the bankruptcy flag on the account. According to Mr. Engel, Wells Fargo is presently handling approximately 90,000 open bankruptcy files and in 2012, Wells Fargo only received seven (7) complaints for violation of the automatic stay. Thus, Mr. Engel explained Wells Fargo has an appropriate system in place to handle accounts in bankruptcy.

---

    Clean Trade-in: $11,300.00
    Clean Retail: $14,275.00

While Wells Fargo admits its actions violated the automatic stay, it contends it should only be liable for damages in the amount of the Debtor's equity in the Vehicle at the time of the auction. As the Vehicle was valued at between $11,000.00 and $14,000.00, Wells Fargo argues damages should be limited to the difference between the value and the amount of its lien of approximately $9,400.00, for total damages ranging from $1,600.00 to $4,600.00. Wells Fargo's Ex. 6.

## DISCUSSION

### I.  Violation of the Automatic Stay

Section 362(a) of the Bankruptcy Code imposes a stay on "any act to obtain possession of property of the estate or to exercise control over property of the estate" as well as "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of a case under" Title 11. 11 U.S.C. § 362 (a)(3), (6); *In re Figured*, No. 09-03251-8-JRL, 2009 WL 2843320, at *2 (Bankr. E.D.N.C. Aug. 31, 2009). Except as provided in 11 U.S.C. § 541(b), (c)(2), property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case" as well as "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(1), (7); *In re Figured*, 2009 WL 2843320, at *2.

Further, the Bankruptcy Code provides that any "individual injured by any willful violation of a stay provided by this section shall recover actual damages including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1). This Court has held "willfulness does not refer to the intent to violate the automatic stay, but the intent to commit the act which violates the automatic stay." *Lofton v. Carolina Fin. LLC (In re Lofton)*, 385 B.R. 133, 140 (Bankr. E.D.N.C. 2008) (citing *Citizens Bank v. Strumpf*, 37 F.3d 155 (4th Cir.1994), *rev'd on other grounds* 516 U.S. 16, 11 (1995)). Furthermore, "[i]f the creditor intentionally acts

and its actions violate the automatic stay, the creditor's acts are willful." *In re Jones*, No. 06-00380-8-RDD, at 3 (Bankr. E.D.N.C. June 27, 2007).

Upon finding willful violations of the automatic stay, the Court may award actual damages, which include monetary damages "to compensate for actual emotional distress caused by a creditor's violation of the automatic stay." *In re Thorpe*, Case No. 11-00862-8-SWH, 2011 WL 5909403 at *2 (Bankr. E.D.N.C. May 17, 2011) (citing *In re Kirkbride*, No. 08-00120-8-JRL, 2010 WL 4809334 (Bankr. E.D.N.C. Nov. 19, 2010) (allowing $10,000.00 damages for humiliation and embarrassment caused by a creditor's actions)). The Court may also award punitive damages for a willful violation of the automatic stay for the purpose of causing "a change in the creditor's behavior . . . ." *In re Sands*, No. 10-12205C-13G, 2011 WL 3962491 at *3 (Bankr. M.D.N.C. April 1, 2011) (quoting *In re Shade*, 261 B.R. 213, 216 (Bankr. C.D. Ill. 2001)). Further, the Court finds § 362(k) allows for recovery of actual damages, including emotional distress. *See In re Thorpe*, Case No. 2011 WL 5909403 at *2; *In re Kirkbride*, 2010 WL 4809334 at *5; *Dawson v. Wash. Mut. Bank (In re Dawson)*, 390 F.3d 1139, 1148 (9th Cir. 2004). "Evidence of emotional distress need not rise to the level necessary to prove intentional infliction of emotional distress or negligent infliction of emotional distress under North Carolina law." *In re Coppersmith*, No. 11-04263-8-RDD, 2012 WL 1192787 at *4 (Bankr. E.D.N.C. April 10, 2012).

In the present case, several issues of fact are undisputed. Both parties agree Wells Fargo caused the Vehicle to be repossessed on September 29, 2009. Again, both parties agree that the Debtor made several payments in hopes of reinstating the loan and have the Vehicle returned. When the Debtor was unable to negotiate for the return of the Vehicle without paying additional storage fees to Adessa, she filed the Chapter 13 petition on January 6, 2010. The Vehicle, still being titled

in the Debtor's name, became property of the bankruptcy estate pursuant to 11 U.S.C. § 541. Wells Fargo had knowledge of the Debtor's bankruptcy petition no later than January 7, 2010. Despite receiving notice of the Debtor's bankruptcy petition, Wells Fargo caused the Vehicle to be auctioned on January 14, 2010 in willful violation of the automatic stay.

     Further, based on the evidence presented, after Wells Fargo repossessed the Vehicle, several issues occurred that prevented the Debtor from receiving a fair outcome. For instance, Wells Fargo's practices of storing the title to the Vehicle in a storage center in Irvine, California instead of locally and storing and auctioning the Vehicle in Charlotte, North Carolina, almost four (4) hours away from the Debtor's home, made retrieval of the Vehicle even more difficult for the Debtor. Additionally, in order to reinstate the note with Wells Fargo and retake possession of the Vehicle, the Debtor was expected to come up with $2,481.00 (including the $825.00 repossession fee), the October 2009 payment of $548.02, and $324.00 for storing the vehicle, all within less than a month's time.

     Other unexplainable events occurred throughout the Debtor's course of dealing with Wells Fargo, such as the confusion of the actual sale date of the Vehicle. It seems probable that Mr. Lapas believed Wells Fargo sold the Vehicle on January 5, 2010 because the Debtor's schedules listed Wells Fargo's claim as unsecured and unliquidated. However, it is unclear why, upon learning that the Vehicle was not sold until January 14, 2010, Mr. Lapas did not file a motion for turnover or demand a replacement vehicle from Wells Fargo. Further, Mr. Lapas failed to file a motion for sanctions for violation of the automatic stay. Had Mr. Lapas done either, the issues between Wells Fargo and the Debtor may have been resolved much earlier in the case.

     Case law suggests a schism among courts on the issue of whether failing to return property repossessed pre-petition after the commencement of a bankruptcy case constitutes a violation of the

automatic stay. *In re Rutherford*, 329 B.R. 886, 891 (Bankr. N.D. Ga. 2005) (explaining the majority of courts hold that upon filing a petition, a creditor must return a repossessed vehicle or move for relief from the automatic stay). While the majority of courts recognize such action as a violation of the stay, the minority courts find that "merely retaining collateral repossessed pre-petition is not an 'act' to exercise control over property of the estate within the meaning of section 362(a)(3)." *Id*. at 892. Regardless of this Court's view on whether retention of collateral repossessed pre-petition is a violation of the automatic stay, in this case, Wells Fargo not only retained the collateral after learning of the bankruptcy petition, but also auctioned the Vehicle. By auctioning the Vehicle with actual knowledge that the automatic stay was in place, Wells Fargo acted to "exercise control over property of the estate" and to "collect, assess, or recover a claim against the debtor that arose before the commencement of a cause under" Title 11. 11 U.S.C. § 362(a)(3), (6).

Mr. Engel's explanation for the violation of the stay does not impute Wells Fargo's knowledge of the bankruptcy petition and willful violation of the automatic stay. Wells Fargo's records indicate notification of the bankruptcy petition at least eight (8) days prior to the actual sale of the Vehicle. Despite this knowledge, Wells Fargo acted intentionally to auction the Vehicle. Thus, Wells Fargo's actions were willful, regardless of whether it intended to violate the automatic stay. *Lofton*, 385 B.R. at 140. Therefore, the Court finds and by Wells Fargo's own admission, that the sale of the Vehicle willfully and intentionally violated the automatic stay.

**II.     Damages**

As Wells Fargo willfully and intentionally violated the automatic stay, the Court must turn to assessment of damages. Section 362(k)(1) provides that except under circumstances non-applicable to the present case, "an individual injured by any willful violation of a stay . . . shall

recover actual damages, including costs and attorneys' fees . . . ." 11 U.S.C. § 362(k)(1). However, a "debtor has the burden to establish by a preponderance of the evidence that he suffered actual damages as a result of the stay violation." *In re Seaton*, 462 B.R. 582, 595 (Bankr. E.D. Va. 2011) (citing *Duby v. U.S. (In re Duby)*, 451 B.R. 664, 670 (1st Cir. BAP 2011)).

The Debtor asserts she is entitled to actual damages for the value of the Vehicle as of September 2009, reimbursement of cost for renting replacement vehicles, physical manifestations of the stress caused by the ordeal, the remaining balance of her Chapter 13 plan payments, and attorney's fees. The Debtor argues she is entitled to the value of the Vehicle because if it were not for the repossession and sale in violation of the automatic stay, the Debtor would still own the Vehicle. The Court finds the Debtor is entitled to actual damages in the amount of $12,500.00 for the value of the Vehicle because if not for the sale in violation of the automatic stay, the Debtor would still be the rightful owner of the Vehicle. Although Wells Fargo asserts the Debtor's damages for the cost of the Vehicle should be limited to the equity over and above the amount of its lien, the Court finds Wells Fargo failed to mitigate the damages by providing the Debtor with a replacement vehicle after selling the Vehicle in January 2010. Therefore, the Debtor is entitled to $12,500.00 based on the average fair market values of the Vehicle in September 2009.

Further, the Debtor seeks reimbursement for the cost of renting other vehicles because transportation was necessary for her job and she was unable to go to work and preform all necessary duties without the Vehicle. The Debtor claims $9,885.00 in car rental fees as damages. However, the Court finds the Debtor failed to mitigate the cost of renting vehicles by purchasing a replacement vehicle on her own. Instead the Debtor chose to continue renting vehicles for some two (2) years after learning that the Vehicle was sold at auction. The significant amounts spent on renting cars

could have been applied to the purchase of another vehicle. Therefore, the Debtor is entitled to the sum of $3,000.00 in damages based on her failure to mitigate the damages by purchasing another car after learning in March 2010 that Wells Fargo sold the Vehicle in violation of the automatic stay.

The Debtor also testified she experienced headaches, dizziness, upset stomach, diarrhea, and high blood pressure. The Debtor stated she took over-the-counter medication for these conditions, with the exception of her high blood pressure, for which she visited a physician who prescribed medication. The Debtor testified that she experienced these physical conditions after the repossession of her vehicle and onward, but failed to establish that the conditions resulted from the violation of the automatic stay. Therefore, the Debtor is not entitled to damages for her physical conditions.

Finally, the Debtor requests damages in an amount comparable to the remainder of her Chapter 13 plan payments because the only reason she filed the bankruptcy petition was for the return of the Vehicle. However, the Debtor again failed to mitigate her damages by choosing to remain in the Chapter 13 case after she learned the Vehicle was auctioned on January 14, 2010 and there was no possibility of its return. Further, the Debtor will benefit significantly from the Chapter 13 discharge as her confirmed Chapter 13 Plan of Reorganization provides for the discharge of $18,245.34 in unsecured debts with no payment to unsecured creditors. Additionally, on May 13, 2010, the Court entered the Order Allowing Debtor's Motion to Pay Mortgage Outside of Chapter 13 Plan, allowing the Debtor's non-filing spouse to make the couple's mortgage payments, thereby significantly reducing the Debtor's Chapter 13 plan payment. As such, the Debtor is not entitled to damages equivalent to the remainder of her Chapter 13 plan payments.

Counsel for the Debtor also requests $8,812.50 in attorney's fees for services leading up to the hearing on the Motion. Movant's Ex. 20. Wells Fargo asserts the amount of fees requested are unreasonable in light of the Debtor's failure to participate in meaningful settlement negotiations.[5] However, based on the factors articulated by the Fourth Circuit in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978), the Court finds attorney's fees in the amount of $8,500.00 to be reasonable.[6]

Accordingly, the Court finds Wells Fargo willfully and intentionally violated the automatic stay by auctioning the Vehicle after receiving actual knowledge of the Debtor's bankruptcy petition. Therefore, the Debtor is entitled to actual damages based on the violation of the automatic stay in the amount of $15,500.00 and attorney's fees in the amount of $8,500.00. Wells Fargo is **ORDERED** to tender the total amount of $24,000.00 to J. Allen Murphy of Gillespie & Murphy, P.A., on or before Monday, June 14, 2013 at 5:00 pm.

**SO ORDERED.**

**END OF DOCUMENT**

---

[5] Counsel for Wells Fargo asserts case law supports this proposition, but did not supply any such cases to the Court.

[6] In *Barber v. Kimbrell's, Inc.*, the Fourth Circuit considered the following factors in determining the reasonableness of attorneys' fees: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. *Barber*, 577 F. 2d at 226 n.28.